# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Kellogg Brown & Root Services, Inc. ) | ASBCA No. 59557 |
| ) | |
| Under Contract No. DAAA09-02-D-0007 ) | |

APPEARANCES FOR THE APPELLANT:      Jason N. Workmaster, Esq.
                                    Raymond B. Biagini, Esq.
                                    Herbert L. Fenster, Esq.
                                    Erin B. Sheppard, Esq.
                                      McKenna Long & Aldridge LLP
                                      Washington, DC

APPEARANCES FOR THE GOVERNMENT:     E. Michael Chiaparas, Esq.
                                      DCMA Chief Trial Attorney
                                    Srikanti Schaffner, Esq.
                                      Trial Attorney
                                      Defense Contract Management Agency
                                      Carson, CA

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN ON APPELLANT'S MOTION FOR AN ORDER DIRECTING THE GOVERNMENT TO FILE THE COMPLAINT

Appellant Kellogg Brown & Root Services, Inc. (KBR) moves the Board to direct the government to file the complaint in this appeal. The government opposes. For the reasons that follow, appellant's motion is granted. The government is directed to file its complaint no later than 30 days from the date of this opinion.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

Contract No. DAAA09-02-D-0007, known as the LOGCAP (Logistics Civil Augmentation Program) Support Contract, was awarded to KBR (then known as Brown & Root Services) on 14 December 2001 (app. supp. R4, tab 9 at 002). Pursuant to the contract, KBR and other contractors were tasked to provide selected services to commanders in support of military and non-military (humanitarian and other) operations (*id.* at 0058). The costs at issue in this appeal were incurred by KBR in its performance of numerous task orders issued to it under the LOGCAP contract (R4, tab 2).

KBR was required by the contract, which incorporated Federal Acquisition Regulation (FAR) Clause 52.228-3, WORKERS' COMPENSATION INSURANCE (DEFENSE

BASE ACT) (APR 1984), to provide workers' compensation insurance for its own employees and to flow down this requirement to its subcontractors (app. supp. R4, tab 9 at 040). Because it was responsible for ensuring that subcontractor employees were covered, and because the contract work was being performed in parts of the world where such insurance might not be easily accessible, KBR elected to provide Defense Base Act (DBA) insurance for its subcontractors to ensure compliance (app. supp. R4, tab 70, ex. A). Under this program, subcontractors provide KBR with estimated payroll for each subcontract enrolled into the program. A separate DBA policy is issued for each subcontract under the master policy. The subcontractors do not reimburse KBR for the premiums and do not include DBA insurance costs in their billings. KBR does not perform reviews of subcontractor payroll due to a lack of certified payroll availability, especially in the Middle East. Through 2005, KBR had provided insurance coverage to 94,405 subcontractor employees who were Third Country Nationals and 81,239 subcontractor employees who were Host Country Nationals. (*Id.* at 2298-99).

KBR's FY 2007 incurred cost proposal was initially submitted on 30 June 2008 (app. supp. R4, tab 91) and after several revisions, a final proposal was submitted on 8 June 2012 (app. supp. R4, tab 102). The incurred cost proposal included the cost of subcontractor DBA premiums paid by KBR.

On 9 May 2014, DCAA provided the draft results of the audit with respect to FY 2007 subcontractor DBA insurance to KBR via email (R4, tab 3). KBR formally responded to the draft results by letter dated 19 May 2014 (R4, tab 6). The audit report itself was finalized and issued on 30 May 2014 (R4, tab 7).

The draft audit results and final audit report do not vary in any substantive respect on the issue of subcontractor DBA insurance costs. The final audit report states:

> We take no exception to the proposed premium rates used to calculate the subcontractor DBA insurance costs. During our examination of the subcontractor DBA insurance costs, the contractor stated it does not "true-up" subcontractor DBA insurance costs based on actual subcontractor labor. KBRSI asserts it does not have visibility of the subcontractors' actual payroll records. However, based on KBRSI's subcontractor DBA insurance policy, the insurance company had the rights [sic] to verify the subcontractors' remuneration. KBRSI was unable to confirm the insurance company (AIG) or insurance broker (Aon) verified the subcontractors' remuneration.

2

The contractor is in noncompliance with
FAR 31.201-2(d) – Determining Allowability which states:

*A contractor is responsible for accounting for costs
appropriately and for maintaining records, including
supporting documentation, adequate to demonstrate
that costs claimed have been incurred, are allocable
to the contract, and comply with applicable cost
principles in this subpart and agency supplements.
The contracting officer may disallow all or part of a
claimed cost that is inadequately supported.*

In addition, the contractor is in noncompliance with
(i) FAR 31.205-19(d)(1) because it did not measure,
assign, and allocate costs in accordance with 48 CFR
9904.416, and (ii) CAS 416-40(b) because it did not
allocate insurance costs to cost objectives based on the
beneficial or causal relationship between the insurance
costs and the benefiting or causing cost objectives. We
separately reported this potential CAS 416 noncompliance
in Audit Report No. 3321-2013H19200004, dated May 1,
2013 (previously provided to your office). The resolution
of this CAS 416 non-compliance is currently in process
and will be processed in accordance with FAR 30.605.

We question $33,851,898 by applying an audit
calculated 43 percent decrement factor to the subcontractor
DBA insurance costs of $78,725,344 proposed under GL
Account No. 600106 – Insurance – Special Property
Damage – Primary because the computation of
subcontractor DBA insurance costs was not based on the
actual subcontractor labor incurred during the year. Our
decrement factor is based on subcontract Master
Agreement GC02HU-VC-ML 5051 for the period October
2006 to September 2007.

In addition, there is an existing noncompliance
with CAS 406.40(b), CAS 416.40(a) and (b), and
CAS 416.50(b)(2) reported in Audit Report
No. 3321-2007K19200001, dated April 20, 2009. The
cited noncompliant practices relate to KBRSI immediately
expensing DBA insurance premiums and allocating these
expenses over open task orders (TOs) without regard to the

3

period of performance of the TO. The results of the Rough Order Magnitude (ROM) were issued under DCAA MFR 3321-2011K49200901, dated February 3, 2012. The estimated impact of the noncompliant practice from Policy Years (PY) 2002 to 2009 is $34,422,957. The costs reported in this audit have not been impacted by this CAS 406/416 noncompliance because the CAS 406/416 noncompliance and the resulting impact will be processed in accordance with FAR 30.605.

(R4, tab 7 at 574-75)

In the following section of the audit report, entitled "basis of Contractor's Cost," DCAA notes that the subcontractor DBA insurance premiums are based on estimated payroll of covered workers for the policy term (R4, tab 7 at 576). Further, DCAA notes that KBR is invoiced by the insurer quarterly based on said estimated payroll, and this premium amount is charged to open task orders at the time the invoice is received (id.). The audit report additionally notes that KBR's subcontractor DBA insurance costs are supported by "bordereaux" files[1] compiled using the DBA applications submitted by the subcontractors (id.). After the subcontractor's application is submitted by KBR to the broker, the broker returns a confirmation of coverage to KBRI who, in turn, provides it to the subcontractor (id.). Subsequently, the same estimated payroll amounts are used to allocate premium costs to the various Work Breakdown Structure (WBS) elements (id.).

In the next section, entitled "Audit Evaluation," DCAA states that it was able to: (1) reconcile the proposed FY 2007 subcontractor DBA insurance cost to invoices received; (2) verify the installment payments made; (3) verify that KBR solicited adequate competitive quotes to ensure the premium was reasonable; and (4) verify that the proposed costs were supported by valid insurance policies (R4, tab 7 at 576).

Finally, DCAA explains that it calculated the 43 percent decrement by examining one of KBR's subcontract Master Agreements and comparing the "estimated DBA premium" per the Master Agreement (a premium amount calculated by multiplying the labor hours invoiced under the Agreement for the period October 2006 to September 2007 by the Iraq/Kuwait premium rate) to the DBA premium amounts invoiced by the insurer and paid by KBR. (R4, tab 7 at 576-77)

In its written response submitted 19 May 2014, KBR took issue with the audit report claim that it had not adequately accounted for the subcontractor DBA costs or

---

[1] According to KBR, bordereaux files list all sub-policies issued for a subcontractor's labor force and any changes to that labor force (R4, tab 6 at 479).

4

provided adequate documentation. It stated that it had provided "all pertinent documentation" including the paid invoices, the bordereaux files, the insurance policies, and the insurance renewal files, to support the premium pricing, and that DCAA had not questioned the cost based on lack of documentation. (R4, tab 6 at 479) KBR also disputed the allegations of CAS noncompliance, and asserted that the method DCAA used to calculate the 43 percent decrement was unreasonable for a number of reasons, including the fact that the decrement was calculated from a single Master Agreement yet applied to all costs incurred in FY 2007; moreover, DCAA was decrementing the *actual* total cost incurred and paid in FY 2007 using an *estimate* of payroll data from one master agreement. (*Id.* at 480) KBR pointed out that it had saved the government money by administering the DBA insurance between the subcontractors and the insurance carrier, as it would have been more expensive if the subcontractors had obtained and administered their own DBA policies (*id.* at 481).

The record in this appeal reflects that DCAA was aware by 2007 that subcontractor DBA insurance premiums were based on estimated subcontract payroll and were not subject to retroactive adjustment based on actual subcontractor payroll costs. For instance, on 24 August 2007, DCAA's Gregory Hartsoe asked:

> Why are adjusting entries being made to policy 8349311, 8 to 12 months after its coverage period closed? My understanding was that subcontract DBA was not subject to final payroll audit due to proprietary restrictions on subcontractor financial data.
>
> ....
>
> Additional data: Please provide the supporting premium calculation worksheets as previously requested. These worksheets should show the estimated subcontractor payroll and applicable premium rate applied.

(*Id.* at 2379-80) KBR's Erin Wilkerson responded on 28 August 2007:

> That is correct, however adjustments are not being made due to "actual payroll" submissions. Adjustments are being made [as] a result of amended applications correcting contract amounts, performance periods, possibly overlooked change orders, terminated contracts, etc – all for compliance reasons and record housekeeping. If this is a practice that needs to be discontinued, we need to discuss.

5

I am continuing to research the support behind the invoices, and will send you the data or updates as soon as I get information.

(*Id.* at 2378-79) In September 2007 this further email exchange took place between Mr. Hartsoe and Ms. Wilkerson:

[DCAA:] Again, my understanding was that subcontract DBA policies were billed at estimated payroll amounts and never subsequently adjusted for actual costs incurred on the subcontracts.

**KBR RESPONSE: That is correct – as stated below, the adjustments are not for "actual payroll" but rather for amended applications. Examples include correcting contract amounts, performance periods, possibly overlooked change orders, terminated contracts, etc – all for compliance reasons and record housekeeping.**

[DCAA:] Since this post close adjustment process seems to be a constantly recurring item, I would like detailed breakout of just what is being done on a recurring basis to cause such adjustments to be made for each quarter.

**KBR RESPONSE: Please reference reasons stated above – this would be on a subcontract by subcontract basis. New DBA applications are processed for each change in estimated payroll. For example, if a change order was issued that increased a scope of work requiring additional labor, the estimated payroll amount would increase, and the total DBA premium would have to be adjusted to cover these additional workers. Therefore, this detailed breakout would be at a change order level on a subcontract by subcontract basis.**

The record does not contain any indication that DCAA objected to the above-described quarterly adjustments to premium costs prior to the time KBR entered into the FY 2007 subcontractor DBA policy. Nor does the record indicate that DCAA objected to the clearly described practice of basing subcontractor DBA insurance premiums on estimated subcontractor payroll prior to the time KBR entered into the FY 2007 subcontractor DBA policy. In 2008, when the same DCAA auditor requested supporting documentation for FY 2007 subcontractor DBA insurance costs, he

6

specifically requested "listing of the subcontracts being covered and estimated payroll for the period for each" (app. supp. R4, tab 89 at 2617-18).

KBR appeals from an administrative contracting officer's (ACO's) final decision, dated 26 June 2014, demanding payment of $33,851,868 in allegedly unallowable Defense Base Act (DBA) insurance costs billed to the government. The final decision sets forth the following as the sole basis for the demand:

> This is my final decision asserting a Government claim for $33,851,868, pursuant to FAR 52.233-1, Disputes, due to the inclusion of unallowable Fiscal Year (FY) 2007 direct costs claimed and billed to the Government. My decision was based on FAR 31.201-2, Determining Allowability, due to KBRSI's computation of subcontract DBA insurance costs claimed and billed under contract no. DAAA-09-02-D-0007. The cost billed was not based on actual subcontractor labor incurred during FY 2007. The following documents are referenced and relied upon in making this decision:
>
> (a) DCAA Audit Report No. 3321-2007K10100001 dated May 30, 2014
> (b) KBRSI's response dated, May 19, 2014

(R4, tab 8)

KBR argues that requiring the government to file the complaint in this case is warranted since the contracting officer's final decision only perfunctorily refers to FAR 31.201 and the fact that KBR's billed subcontractor DBA insurance costs were not based on actual subcontractor labor, but does not provide any additional detail and does not specify what portions of the "referenced and relied upon" documents are relevant to the decision. KBR asserts that unless the government is required to file the complaint, it will have been excused from "having to proffer a basic legal and factual rationale for its demand of the significant sum at issue in this Appeal, resulting in a [KBR] complaint simply disagreeing with the bare-bones conclusions of the Final Decision and a Government answer simply denying these...positions. Such pleadings would do little, if anything, to advance this Appeal." (App. mot. at 2-3)

The government asserts in opposition to KBR's motion that: (1) the basis for the government's claim is evident from numerous communications that took place prior to the issuance of the ACO's final decision; (2) "KBR is well aware that the basis for the Government's claim is that KBR has failed to show that DBA premiums based on estimated, rather than actual subcontractor labor, are reasonable"; (3) it is KBR that

7

bears the burden of proving the claimed costs to be reasonable pursuant to FAR 31.201-3(a); and (4) the facts bearing on the reasonableness of the claimed costs, i.e., "the information regarding the basis upon which the DBA insurance premiums were calculated and paid," are within KBR's possession and are not known to the ACO (gov't reply).[2]

## DECISION

Under the unique procedural requirements of the Contract Disputes Act (CDA), all claims, whether contractor or government claims, must be the subject of a contracting officer's final decision. 41 U.S.C. § 7103. The contractor, however, is the only party who may initiate proceedings at the Board, 41 U.S.C. § 7104, and Board Rule 6(a) requires the appellant to file the complaint in an appeal. If the contractor appeals from a final decision on a government claim, the contractor typically presents in its complaint enough information about the government claim to form a sufficient predicate for the government's answer and allow for adequate framing of the issues. Thus, the fact that the appeal involves a government claim is not enough, in and of itself, to justify requiring the government to file the complaint.

In appropriate cases, the Board may exercise its discretion to require the government to file the complaint, if doing so will facilitate efficient resolution of the appeal. *BAE Systems Land & Armaments Inc.*, ASBCA No. 59374, slip. op. (18 November 2014); *Beechcraft Defense Co.*, ASBCA No. 59173, 14-1 BCA ¶ 35,592. Such situations can arise if relevant information concerning the basis for the claim resides with the government, not the contractor. In *BAE Systems*, for example, the contracting officer issued a "Defective Pricing Demand Letter" based on a DCAA audit report alleging defective pricing, but the demand letter did not purport to be a contracting officer's final decision. BAE filed a certified claim challenging the government's demanded price adjustment, and over a year later the contracting officer issued a final decision denying BAE's claim. The Board granted BAE's motion, noting that BAE's "claim" was more in the nature of a defense against the government's claim of defective pricing, and further stating:

> [T]he contracting officer's final decision does not explain
> in any depth why it rejected the contractor's arguments,
> except with occasional summary remarks. In these
> particular circumstances, proceedings would be more

---

[2] In addition to KBR's motion, the government's reply, and KBR's response thereto, KBR filed a Notice of Supplemental Authority referencing this Board's decision in *BAE Systems*, cited herein, and the government filed a reply to appellant's notice. All of these filings and the exhibits thereto have been considered by the Board in reaching its decision.

8

efficient if the Board could start with a government articulation of the basis for its determination of defective pricing, rather than appellant's speculation about the basis for the government's assertions.

*BAE Systems*, slip. op. at 3 (citation omitted). In *Beechcraft*, the contractor appealed from a DCMA contracting officer's final decision finding its accounting practices noncompliant with Cost Accounting Standard (CAS) 402. The government acknowledged that the appeal involved a government claim, but argued that appellant was in the best position to assert facts establishing its compliance with the standard. The Board held that since the burden of establishing noncompliance was on the government, the proceedings would be facilitated by the government's filing an initial pleading setting forth the facts and rationale in support of its claim. 14-1 BCA at 174,395.

In this case, the government has asserted that $33.9 million in subcontractor DBA insurance premium costs incurred by KBR in performing the LOGCAP contract are unallowable, yet it has not articulated a basis for its claim. The Board has examined the ACO's decision which does not explain the rationale for finding these costs unallowable. The final decision includes the summary sentence: "The cost billed was not based on actual subcontractor labor incurred during FY 2007" but does not explain why that fact, in the contracting officer's opinion, renders the costs unallowable. It is important to note the costs billed were KBR's actual incurred premium costs, as confirmed by the DCAA audit.

The final decision also states that it references and relies on the DCAA audit report and KBR's response to that report. The Board has examined the audit report, which states that it is disallowing the costs based on KBR's failure to "true up" its subcontractor DBA insurance costs based on actual subcontractor payroll, and that this failure to "true-up" is a noncompliance with FAR 31.201-2(d), which requires contractors to maintain records sufficient to demonstrate that claimed costs have been incurred, are allocable to the contract, and comply with applicable cost principles.

However, the audit report does not explain what significance, if any, actual subcontractor labor costs (even if such information were available to KBR) would have to the issue of the allowability of KBR's subcontractor DBA insurance costs, which were based on estimated subcontractor payroll and not subject to adjustment based on actual subcontractor payroll.

The government argues that KBR is "well aware" that the basis for the government's claim is that "KBR has failed to show that DBA premiums based on estimated, rather than actual subcontractor labor, are reasonable;" that the burden is on a contractor to prove the reasonableness of incurred costs once challenged by the government; and that KBR, not the ACO, possesses the facts bearing on the issue of

9

reasonableness, i.e., "the information regarding the basis upon which the DBA insurance premiums were calculated and paid." But neither the ACO's final decision nor the DCAA audit report articulates a reasonableness challenge to KBR's incurred DBA insurance costs. To the contrary, the audit report affirmatively states that KBR solicited adequate competitive quotes to ensure the premium was reasonable, and the operative FAR provision on cost reasonableness, FAR 31.201-3, is not cited in either the audit report or the ACO's decision in connection with this issue. Moreover, the record would seem to indicate that DCAA, and therefore the government, received all the information it requested regarding "the basis upon which the DBA insurance premiums were calculated and paid."

Finally, the government asserts that the basis for its claim is clear from "the communications between the parties" leading up to the issuance of the final decision on 26 June 2014. The Board has therefore examined all of the communications between the parties in the record before it. None of these communications articulates a basis for the government's claim.

Simply stated, appellant should not have to speculate about the basis for the government's claim in its complaint. Thus, we find that proceedings in this appeal would be facilitated by the government's filing the initial pleading setting forth the basis or bases for its claim that KBR's FY 2007 subcontractor DBA insurance costs are unallowable.

## CONCLUSION

The Board grants appellant's motion to direct the government to file the complaint in this appeal. The government is directed to file the complaint no later than 30 days from the date of this opinion. Appellant's answer shall be due 30 days following receipt of the government's complaint.

Dated: 22 January 2015

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur                                I concur

MARK N. STEMPLER                 RICHARD SHACKLEFORD
Administrative Judge                  Administrative Judge
Acting Chairman                       Vice Chairman
Armed Services Board                Armed Services Board
of Contract Appeals                  of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59557, Appeal of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

11